**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

BRYSHAWN DUNKLEY,                    Civil No. 14-7232 (NLH/KMW)

         Plaintiff,

                                  **OPINION**

    v.

BOARD OF EDUCATION OF THE
GREATER EGG HARBOR REGIONAL
HIGH SCHOOL DISTRICT, SCOTT
PARKER, and EDWARD OTTEPKA,

         Defendants.

---

**APPEARANCES**:

WILLIAM A. RIBACK
WILLIAM RIBACK, LLC
132 HADDON AVENUE
HADDONFIELD, NJ 08033
    On behalf of plaintiff

TIMOTHY R. BIEG
MICHAEL PAUL MADDEN
MADDEN & MADDEN
108 KINGS HIGHWAY EAST, SUITE 200
P.O. BOX 210
HADDONFIELD, NJ 08033-0389
    On behalf of defendants

**HILLMAN**, District Judge

    This case involves a high school student's allegations that his First Amendment and other rights were violated when the Greater Egg Harbor Regional High School District suspended him for out-of-school YouTube video and Twitter postings regarding other students that the school determined to be in violation of the state's anti-bullying statute and the school's anti-bullying

policies.  Presently before the Court are defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment.  For the reasons expressed below, defendants' motion will be granted, and plaintiff's motion will be denied.

## BACKGROUND

In December 2013, plaintiff, Bryshawn Dunkley,[1] was a senior at Cedar Creek High School, which is part of the Greater Egg Harbor Regional High School District, when he was suspended for two days for his out-of-school YouTube account, which contained a video criticizing a football teammate.

In February 2014, plaintiff was suspended for nine days for content on an out-of-school, anonymous Twitter account – called Cedar Creek Raw - of which plaintiff shared control with another student.  The school became aware of the existence of the Twitter account through complaints from students and parents. The Twitter account included postings such as:

- THOT list (Those Hoes Over There)
  Quads [a nickname used to refer to certain family members who were students at Cedar Creek]
  Brittney E[***][2]

---

[1] When his complaint was filed, Bryshawn was a minor, and his father, Brian Dunkley, lodged claims on Bryshawn's behalf in addition to his own claims.  Bryshawn has since turned 18, and is advancing his own claims.  Brian Dunkley's claims have been either resolved or dismissed.

[2] For purposes of this Opinion, the Court will redact certain full names and twitter "hashtags" which the parties have submitted to the Court in full.  The full names and other identifiers need not be repeated for purposes of this Opinion.

- "I wonder if @m[***********] owns a can opener because if not, her teeth can DEFINITELY get the job done"
- L[*********#twins #buglookingnigga #bigeyes
- @L[**********@L[****_M[******]. You should get married and have kids, I'll show you what it would look like #bigeyedbanana (pic attached on twitter)
- There is nothing funnier than a senior who doesn't start so @a[************] cracks me up
- Usually girls get better looking when they get their braces off but that not the case with @K[***********]

(Docket No. 33-7 at 10.)

Defendants Vice-Principal Scott Parker and school resource officer Edward Ottepka investigated the Twitter account, and questioned plaintiff about his involvement.  Plaintiff denied he was involved in the Twitter postings.  After Parker and Ottepka met with the Twitter account's co-owner, who admitted that he and plaintiff created and posted on the account, plaintiff admitted his involvement.  Plaintiff only admitted to postings that criticized another student's athletic ability, but based on the representations of the account's co-owner, the school administrators determined that plaintiff was responsible for posting more than he acknowledged, and determined that plaintiff's actions violated the school's policy against harassment, bullying, and intimidation.

In addition to his nine-day suspension, on February 21, 2014, the school filed a formal juvenile complaint with the Atlantic County Prosecutor's Office through the Egg Harbor Township Police Department against plaintiff for "purposely

committing acts of harassment by opening an electronic Twitter account and then knowingly using said account to make repeated and anonymous offensive communications against others in a manner that caused annoyance and alarm," in violation of N.J.S.A. 2C:33-4a.[3]  (Docket No. 33-4 at 6.)

Following the Court's decision on defendants' motion to dismiss (Docket No. 22), the following claims remained pending regarding plaintiff's discipline for the YouTube and Twitter postings: 1) plaintiff's claims against school resource officer Edward Ottepka and Vice-Principal Scott Parker for violations of the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2 ("NJCRA"), New Jersey Constitution, Article 1, Paragraph 6, and the First Amendment to the U.S. Constitution pursuant to § 1983; and (2) plaintiff's claims against the Board of Education for violations of the First Amendment to the U.S. Constitution pursuant to § 1983.

Defendants have moved for summary judgment on plaintiff's claims against them, and plaintiff has cross-moved for summary judgment in his favor.

---

[3] Plaintiff testified that he pleaded guilty to the harassment charge but then also related that the charges were dropped. (Docket No. 33-2 at 90).  The transcript of the hearing shows the plaintiff pleaded guilty (Docket No. 37-14 at 22), but then the hearing officer ultimately dismissed the charge (id. at 27).

**DISCUSSION**

**A.   Subject matter jurisdiction**

Plaintiff has brought his claims for violations of the
federal and New Jersey constitutions, as well as under New
Jersey state law.  This Court has jurisdiction over plaintiff's
federal claims under 28 U.S.C. § 1331, and supplemental
jurisdiction over plaintiff's state law claims under 28 U.S.C. §
1367.

**B.   Standard for Summary Judgment**

Summary judgment is appropriate where the Court is
satisfied that the materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations, admissions, or
interrogatory answers, demonstrate that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.  Celotex Corp. v.
Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).  If
the review of cross-motions for summary judgment reveals no
genuine issue of material fact, then judgment may be entered in
favor of the party deserving of judgment in light of the law and
undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d
298, 302 (3d Cir. 1998) (citation omitted).

**C.   Analysis**

Plaintiff contends that he was inappropriately disciplined

- and his civil rights violated - for his out-of-school postings
on YouTube and Twitter because they were innocuous and not
disruptive to the school.  Defendants' position is that they
properly regulated plaintiff's out-of-school speech because
plaintiff's internet postings disparaged and otherwise harassed,
intimidated and bullied fellow students, which, along with
plaintiff's initial denial of his involvement, caused a
substantial disruption at Cedar Creek High School, and
implicated defendants' duty to respond to the complaints of
harassment, intimidation and bullying ("HIB") under the New
Jersey Anti-Bullying Bill of Rights Act.

In relevant part, the First Amendment proclaims:  "Congress
shall make no law . . . abridging the freedom of speech."  It
guarantees "both the right to speak freely and the right to
refrain from speaking at all."  <u>Wooley v. Maynard</u>, 430 U.S. 705,
714 (1977).  "Government actions, which standing alone do not
violate the Constitution, may nonetheless be constitutional
torts if motivated in substantial part by a desire to punish an
individual for exercise of a constitutional right."  <u>Mitchell v.
Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) (quotations and citations
omitted).

The authority for a school to discipline a student for his
out-of-school speech derives from Supreme Court precedent and
New Jersey state law.  "[S]tudents do not shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate," but the First Amendment has to be "applied in light of the special characteristics of the school environment." Morse v. Frederick, 551 U.S. 393, 396-97 (2007) (quotations and citations omitted).  Under the general rule set forth in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513 (1969), school speech may be restricted if it can be "justified by a showing that the students' [speech] would materially and substantially disrupt the work and discipline of the school."[4]

The authority of the school to do so is not limited to in-school speech, as "schools may punish expressive conduct that occurs outside of school, as if it occurred inside the 'schoolhouse gate.'"  Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 219 (3d Cir. 2011).  "[I]f a school can point to a well-founded expectation of disruption . . . the

---

[4] The Supreme Court has identified three "narrow" circumstances in which the government may restrict student speech even when there is no risk of substantial disruption or invasion of others' rights: (1) vulgar, lewd, profane, or plainly offensive speech in schools, even if it would not be obscene outside of school, (2) speech that "a reasonable observer would interpret as advocating illegal drug use" and that cannot "plausibly be interpreted as commenting on any political or social issue," and (3) restrictions on school-sponsored speech that are "reasonably related to legitimate pedagogical concerns." B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 303-04 (3d Cir. 2013) (some quotations and citations omitted).

restriction may pass constitutional muster." <u>Saxe v. State</u>
<u>Coll. Area Sch. Dist.</u>, 240 F.3d 200, 212 (3d Cir. 2001).  This
burden cannot be met, however, if school officials are driven by
"a mere desire to avoid the discomfort and unpleasantness that
always accompany an unpopular viewpoint." <u>J.S. ex rel. Snyder</u>
<u>v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915, 926 (3d Cir. 2011).

With regard to speech that constitutes harassment,
intimidation or bullying, the New Jersey Legislature enacted the
Anti-Bullying Bill of Rights Act, N.J.S.A. 18A:37-13.2, et seq.,
to  "strengthen the standards and procedures for preventing,
reporting, investigating, and responding to incidents of
harassment, intimidation, and bullying" occurring both on and
off of school grounds.  N.J.S.A. 18A:37-13.1(f).  Each school
district in New Jersey is required to "adopt a policy
prohibiting harassment, intimidation or bullying on school
property," which includes notification of the "consequences and
appropriate remedial action for a person who commits an act of
harassment, intimidation or bullying," "a procedure for
reporting an act of harassment, intimidation or bullying,
including a provision that permits a person to report an act of
harassment, intimidation or bullying anonymously," and "a
procedure for prompt investigation of reports of violations."
N.J.S.A. 18A:37-15.  "The policy adopted by each school district
. . . shall include provisions for appropriate responses to

harassment, intimidation, or bullying . . . that occurs off
school grounds, in cases in which a school employee is made
aware of such actions." N.J.S.A. 18A:37-15.3.

The statute defines "harassment, intimidation or bullying"
to mean:

> [A]ny gesture, any written, verbal or physical act, or any
> electronic communication, whether it be a single incident
> or a series of incidents, that is reasonably perceived as
> being motivated either by any actual or perceived
> characteristic, such as race, color, religion, ancestry,
> national origin, gender, sexual orientation, gender
> identity and expression, or a mental, physical or sensory
> disability, or by any other distinguishing characteristic,
> that takes place on school property, at any school-
> sponsored function, on a school bus, or off school grounds
> as provided for in section 16 of P.L.2010, c. 122
> (C.18A:37-15.3), that substantially disrupts or interferes
> with the orderly operation of the school or the rights of
> other students and that:
>
> a. a reasonable person should know, under the
> circumstances, will have the effect of physically or
> emotionally harming a student or damaging the student's
> property, or placing a student in reasonable fear of
> physical or emotional harm to his person or damage to his
> property;
>
> b. has the effect of insulting or demeaning any student or
> group of students; or
>
> c. creates a hostile educational environment for the
> student by interfering with a student's education or by
> severely or pervasively causing physical or emotional harm
> to the student.

N.J.S.A. 18A:37-14.

Within the foregoing parameters of a school's ability to
restrict a student's speech, in order to prove a First Amendment
violation claim a plaintiff must show: (1) constitutionally

protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.  Mitchell, 318 F.3d at 530.  "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006) (citing McKee v. Hart, 436 F.3d 165, 170 (3d Cir.2006) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)).[5]

In this case, even drawing all favorable inferences in plaintiff's favor, the Court cannot find that defendants violated plaintiff's rights under the New Jersey or federal constitutions to free speech because plaintiff's speech was of the type the school was permitted to – and indeed required to – restrict.

---

[5] In order to support his First Amendment violation claim against the School Board, plaintiff must show that it "acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity," or "when the decision-maker has policy making authority rendering his or her behavior an act of official government policy," or "an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (discussing Monell v. Dep't. of Soc. Serv., 436 U.S. 658, 694 (1978).  Plaintiff has failed to provide any evidence to support any of these theories of municipal liability.

First, with regard to the December 2013 YouTube video, even accepting plaintiff's position that his video criticizing another player's prowess at football does not qualify as HIB speech, the two-day suspension did not chill plaintiff's exercise of his First Amendment rights.  Just a few weeks after being disciplined for the YouTube video, plaintiff made postings on the Twitter account regarding the same individual's athletic abilities.  A First Amendment violation claim cannot be sustained when the plaintiff's cannot establish a key element of that claim.

Next, with regard to the Twitter account, the content of the messages that were posted on the account co-owned and operated by plaintiff clearly fall into the definition of "harassment, intimidation or bullying" detailed in N.J.S.A. 18A:37-14.  The "tweets" were insulting and demeaning to plaintiff's classmates, and were motivated by race, gender, or other distinguishing characteristics of those students. Although plaintiff denies posting any comments other than those directed to disparaging a certain student's athletic abilities, such comments still fall into the definition of HIB.  Moreover, plaintiff does not dispute that he was a co-participant in the operation of the Twitter account, which unarguably contained disparaging comments directed to students' race, gender and other physical and mental characteristics.  Additionally, it

appears from the record that the school officials were able to capture several screen shots of the Twitter account before it was deactivated, but the postings captured and listed by defendants are not the entirety of the posts on the Cedar Creek Raw.

It is of no moment that one of the targets of plaintiff's taunts is, according to plaintiff, still his friend.  The entirety of Cedar Creek Raw, for which plaintiff was co-responsible, contained HIB speech, about which students and parents complained, and those complaints were not limited to plaintiff's friend.  The administrators were required by state law to investigate the complaints about plaintiff's Twitter account, which took them away from other school duties.  This disruption was compounded by plaintiff initially lying about his involvement, causing the school administrators to continue their investigation.  Complaints from parents and students about the HIB-speech content of the Twitter account, and an investigation into those complaints, which was stymied by plaintiff's intentional decision to lie about his involvement, constitute the "material and substantial disruption" to the "work and discipline of the school" requirement necessary to permit the school to discipline plaintiff for his out-of-school speech.

To rebut this conclusion, plaintiff makes several unavailing arguments in addition to those referenced above.

First, plaintiff argues that only inadmissible hearsay – in the form of undocumented parent and student complaints - supports the school's awareness of the Twitter account that triggered its investigation, and the existence of the "tweets" attributable to plaintiff.  Without admissible evidence, plaintiff argues that defendants cannot support their burden of showing that their investigation was required under the Anti-Bullying Act and that it resulted in disruption to the school.  In other words, it seems that plaintiff is arguing that because no admissible proof supports the existence of parent and student complaints, defendants' investigation was motivated not by their obligations under the Anti-Bullying Act but rather by a desire to restrict unconstitutionally plaintiff's out-of-school freedom of expression.

This argument is meritless.  Without parents or students reporting the existence of the Twitter account to the school administrators, which may be done anonymously under the Act, N.J.S.A. 18A:37-15, how would the school administrators learn about the Twitter account?  They would need to "hear" about it in some fashion in order to view it.  Putting that aside, plaintiff himself ultimately admitted to his involvement in the Twitter account.  The existence of the Twitter account, its contents, and the resulting investigation are supported by plaintiff's own statements, which clearly are not hearsay.

Second, plaintiff argues that the colloquy at the court hearing for the harassment charge shows that Ottepka admitted that plaintiff only made two jokes on Twitter about another student's basketball abilities, which therefore does not support the discipline plaintiff received for exercising his right to free speech.

The transcript of the hearing does not support this position.  Plaintiff pleaded guilty to the harassment charge, and briefly described the situation to the hearing officer by stating that he and his friend created a Twitter account to anonymously make fun of other students and used it to tweet about a basketball player.  (Docket No. 37-14 at 22-23.)  The hearing officer asked Ottepka if that was what happened, Ottepka replied, "pretty much."  The hearing officer asked if Ottepka had anything more to add, and he said no.  (Id. at 23.)  These statements do not support plaintiff's attempt to discredit the school's determination that plaintiff made HIB speech on Twitter.

Plaintiff argues that his case is analogous to cases that involved two out-of-school MySpace "parody pages" of high school principals created by students.  Those types of pages were held to be free speech that could not be restricted because there was no evidence that these webpages substantially disrupted the school environment other than to insult the principal.  See

Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205,
217 (3d Cir. 2011); J.S. ex rel. Snyder v. Blue Mountain Sch.
Dist., 650 F.3d 915, 920 (3d Cir. 2011).  The Court does not
agree.  This case is more akin to an out-of-school MySpace
webpage titled "Students Against Shay's Herpes," which was
created by a high school student in reference to another high
school student, Shay N., who was the main subject of discussion
on the webpage.  See Kowalski v. Berkeley Cty. Sch., 652 F.3d
565, 568-69 (4th Cir. 2011).

In Kowalski, the Fourth Circuit found that the school did
not violate the website creator's First Amendment rights when
she was suspended for nine days for creating a "hate website" in
violation of the school policy against "harassment, bullying,
and intimidation," because the website met the Tinker test for
being disruptive to the school environment.  Kowalski, 652 F.3d
at 568-69.  The court explained:

> While Kowalski does not seriously dispute the harassing
> character of the speech on the "S.A.S.H." webpage, she
> argues mainly that her conduct took place at home after
> school and that the forum she created was therefore subject
> to the full protection of the First Amendment.  This
> argument, however, raises the metaphysical question of
> where her speech occurred when she used the Internet as the
> medium.  Kowalski indeed pushed her computer's keys in her
> home, but she knew that the electronic response would be,
> as it in fact was, published beyond her home and could
> reasonably be expected to reach the school or impact the
> school environment.  She also knew that the dialogue would
> and did take place among Musselman High School students
> whom she invited to join the "S.A.S.H." group and that the
> fallout from her conduct and the speech within the group

would be felt in the school itself.  Indeed, the group's name was "Students Against Sluts Herpes" and a vast majority of its members were Musselman students. As one commentator on the web-page observed, "wait til [Shay N.] sees the page lol."  Moreover, as Kowalski could anticipate, Shay N. and her parents took the attack as having been made in the school context, as they went to the high school to lodge their complaint.

There is surely a limit to the scope of a high school's interest in the order, safety, and well-being of its students when the speech at issue originates outside the schoolhouse gate. But . . . [g]iven the targeted, defamatory nature of Kowalski's speech, aimed at a fellow classmate, it created "actual or nascent" substantial disorder and disruption in the school.  First, the creation of the "S.A.S.H." group forced Shay N. to miss school in order to avoid further abuse.  Moreover, had the school not intervened, the potential for continuing and more serious harassment of Shay N. as well as other students was real. Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in "copycat" efforts by other students or in retaliation for the initial harassment.

Kowalski, 652 F.3d at 573 (citing Tinker, 393 U.S. at 508, 513;

Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 257

(3d Cir. 2002) (indicating that administrators may regulate

student speech any time they have a "particular and concrete

basis" for forecasting future substantial disruption)).

Here, plaintiff admittedly co-managed a Twitter account

which posted demeaning and derogatory comments about fellow

students.  The page was directed at his fellow high school

students – calling it Cedar Creek Raw – and it garnered 50-100

followers during its existence.  Plaintiff clearly intended the

subjects of the tweets contained on that page to read them or

hear about them, as well as the 50-100 other students who
followed the page.  Parents and students complained to the
school about plaintiff's Twitter page, and the school defendants
were required by state law to investigate the complaints.
Plaintiff initially lied to school administrators during their
investigation about his involvement, which extended their need
to interrupt their other professional obligations to continue
investigating the source of the Twitter account.  Moreover, as
observed by the court in Kowalski, if plaintiff's Twitter page
had been left unaddressed, it could have multiplied the
harassment and bullying of other students and further increased
the impact on the school operations.

     The difference between this case and Kowalski, and
Layshock and Blue Mountain, is that plaintiff's Twitter account
and Kowalski's MySpace page implicated anti-bullying policies
and procedures set in place to manage harassment, intimidation
and bullying against other students, whether that harassment,
intimidation and bullying occurs on-site or off-site.  As
pointed out in Kowalski, if plaintiff's Twitter account had been
created using a school-provided computer and Internet
connection, the "case would be more clear-cut, as the question
of where speech that was transmitted by the Internet 'occurred'
would not come into play. . . .  In that case, because it was
determined to be in-school speech, its regulation would be

permissible not only under <u>Tinker</u> but also, as vulgar and lewd in-school speech, under <u>Fraser</u>. <u>Kowalski</u>, 652 F.3d at 573; <u>see also Layshock</u>, 650 F.3d at 220–21 (Jordan, J. concurring) (en banc) (noting that the "heavy focus in the concurrence on an 'off-campus versus on-campus' distinction is artificial and untenable in the world we live in today. For better or worse, wireless internet access, smart phones, tablet computers, social networking services like Facebook, and stream-of-consciousness communications via Twitter give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools. <u>Tinker</u> teaches that schools are not helpless to enforce the reasonable order necessary to accomplish their mission").

Consequently, because plaintiff's out-of-school speech reached into the school, constituted harassment, intimidation and bullying, and triggered the school's obligations under the Anti-Bullying Act, the Court cannot find that defendants violated plaintiff's First Amendment rights.[6]

---

[6] Because the Court has determined that defendants did not violate plaintiff's constitutional rights, the Court does not need to undertake the second part of the qualified immunity analysis. <u>McKee v. Hart</u>, 436 F.3d 165, 169 (3d Cir. 2006) (citations and quotations omitted) ("Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to

The Court must pause before concluding to address several issues raised by plaintiff in his briefing.  Plaintiff appears to argue that commingled with his claim that defendants violated N.J.A.C. 6A:16-7.5(b), his procedural and substantive due process rights were violated regarding defendants' purported failures in conducting its investigation of HIB complaints against plaintiff, and defendants' alleged failures in informing plaintiff of his rights to challenge his suspension.  These due process claims are not a part of plaintiffs' case, as evidenced by the Court's Opinion resolving plaintiff's motion for leave to file an amended complaint and defendants' motion to dismiss. Nonetheless, the Court wishes to address several arguments made by plaintiff to the extent that these issues inform the analysis of plaintiff's free speech claims.

Plaintiff argues that defendants violated N.J.A.C. 6A:16-7.5(b), which provides, "School authorities shall respond to harassment, intimidation, or bullying that occurs off school grounds, pursuant to N.J.S.A. 18A:37-14 and 15.3 and N.J.A.C. 6A:16-1.3, 7.1, and 7.7." Plaintiff argues that this provision

---

have violated. To determine whether an official has lost his or her qualified immunity, we must first decide whether a constitutional right would have been violated on the facts alleged.  If the answer to that question is 'yes,' we must then consider whether the right was clearly established.  If we also answer 'yes' to the second question, we must conclude that the official does not have qualified immunity.").

was violated because:

(1) *Plaintiff was not provided with the procedural protections of N.J.S.A. 18A:37-14, which is the provision quoted above with regard to the definition of "harassment, intimidation or bullying."*

Plaintiff argues that his speech, even if he were held accountable for the entirety of the Twitter account postings, does not qualify as HIB speech because it was not disruptive to the school.  He also argues that the comment "nigga bug eyes" is not directed at a student's race, and therefore does not constitute restrictable speech, because plaintiff is black and the target of that tweet is white.

The Court has already found that the tweets plaintiff admitted to, along with the remainder of the postings for which he is responsible as co-owner of the account, caused, and could have continued to cause, disruption to the school if the school had not intervened.  Plaintiff's second argument is not only misguided, it is factually inaccurate as the content of the Twitter account was not limited to race-related comments.

(2) *Defendants did not advise plaintiff's parents of their procedural rights under N.J.S.A. 18A:37-15(b)(11) because the school did not post the appeal procedures on its website or mail the procedures to them;*

(3) *defendants precluded plaintiff's right of review and*

*appeal up to the Commission of Higher Education pursuant to*

*N.J.S.A. 18A:37-15(b)(11) and (b)(6)(a)-(e);*

(4) *the Anti-Bullying specialist did not conduct the*

*investigation;*

These three arguments are without merit.  On February 24, 2014, Vice-Principal Parker mailed a letter to plaintiff's parents explaining that plaintiff violated the harassment, intimidation and bullying policy, he was being suspended and criminal charges were being filed, they could contact the homebound coordinator for homebound instruction during the suspension period, an administrative review conference was scheduled for March 6, 2014 in the principal's office, and their attendance was required.  (Docket No. 33-2 at 43.)  Plaintiff has not submitted any evidence to support how defendants thereafter violated the hearing and appeal procedures set forth in the Anti-Bullying Act.

With regard to the Anti-Bullying Specialist argument, the school's Anti-Bullying Specialist, Erin Byrnes, participated in the investigation.  (Docket No. 33-5 at 4.)  Moreover, the Anti-Bullying Act does not require the Anti-Bullying Specialist to be the only school official who may conduct the investigation.  See N.J.S.A. 18A:37-15(6)(a) ("[T]he investigation shall be initiated by the principal or the principal's designee within one school day of the report of the incident and shall be

conducted by a school anti-bullying specialist.  The principal

may appoint additional personnel who are not school anti-

bullying specialists to assist in the investigation.").

     (5) *Vice-Principal Parker made findings of fact and imposed*

*final discipline contrary to N.J.S.A. 18:A:37-15(b)(6)(a) and*

*(b)*.

     Plaintiff argues that the discipline for his infraction was

required to be "varied and graded according to the nature of the

behavior, the developmental age of the student, and the

student's history of problem behaviors and performance,"

according to N.J.A.C. 6A:16-7.1, and defendants failed to do so.

     Other than stating that defendants failed to perform the

analysis required by N.J.A.C. 6A:16-7.1, plaintiff has not

provided any evidence to support that argument.

     Finally, the Anti-Bullying Act "shall not be interpreted to

prevent a victim from seeking redress under any other available

law, either civil or criminal, and does not create or alter any

tort liability,"  N.J.S.A. 18A:37-37, and therefore cannot

support an independent cause of action.  The NJCRA also does not

provide for a procedural due process claim.  Major Tours, Inc.

v. Colorel, 799 F. Supp. 2d 376, 405 (D.N.J. 2011) ("[A]

procedural due process claim cannot be brought under the

NJCRA.").

     In sum, plaintiff's attempts to include due process claims

within his claim for violations of N.J.A.C. 6A:16-7.6 fail.  As for his direct claim that defendants violated N.J.A.C. 6A:16-7.6, the New Jersey Appellate Division has explained, "A plain reading of N.J.A.C. 6A:16-7.6 reveals that the authority granted to a local board to regulate student conduct is conditioned upon the board demonstrating: (1) that the regulation is reasonably necessary to protect the physical and emotional safety of a student; and (2) that the conduct subject to disciplinary consequences materially and substantially interferes with the orderly operation of the school." G.D.M. v. Board of Education of the Ramapo Indian Hills Regional High School Dist., 48 A.3d 378, 386 (N.J. Super. Ct. App. Div. 2012).  The Court's analysis of plaintiff's First Amendment violation claim demonstrates that plaintiff cannot support his claim for a violation of N.J.A.C. 6A:16-7.6.[7]

## CONCLUSION

The Court is mindful of the significant importance of the First Amendment and how students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Morse, 551 U.S. at 396.  The New Jersey

---

[7] It is also questionable whether an independent cause of action exists for a school's alleged violation of this New Jersey regulation.  See Castro v. NYT Television, 851 A.2d 88, 93 (N.J. Super. App. Div. 2004) ("New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action.").

Legislature has made it clear, however, that the First Amendment does not protect student speech that amounts to harassment, intimidation, or bullying of other students.  In enacting the Anti-Bullying Bill of Rights Act:

> The Legislature finds and declares that: a safe and civil environment in school is necessary for students to learn and achieve high academic standards; harassment, intimidation or bullying, like other disruptive or violent behaviors, is conduct that disrupts both a student's ability to learn and a school's ability to educate its students in a safe environment; and since students learn by example, school administrators, faculty, staff, and volunteers should be commended for demonstrating appropriate behavior, treating others with civility and respect, and refusing to tolerate harassment, intimidation or bullying.

N.J.S.A. 18A:37-13.

The Legislature further noted that in 2008 "32% of students aged 12 through 18 were bullied in the previous school year," "25% of the responding public schools indicated that bullying was a daily or weekly problem," and that by 2010, "the chronic persistence of school bullying has led to student suicides across the country, including in New Jersey."  N.J.S.A. 18A:37-13.1.  The Legislature's intent in enacting the Anti-Bullying Act was to "strengthen the standards and procedures for preventing, reporting, investigating, and responding to incidents of harassment, intimidation, and bullying of students that occur in school and off school premises."  Id.

To that end, although schools are required to provide

students with some level of due process, "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." <u>Fraser</u>, 478 U.S. at 686 (quotation omitted).

In this case, plaintiff may not feel that his YouTube video and Twitter posts were harassing, intimidating, or bullying to other students, and that the discipline imposed for his conduct was unwarranted. But under the law governing speech by students in and out of school, in conjunction with the purpose and goals of the Anti-Bullying Act, the Court finds that plaintiff's First Amendment rights, and the attendant procedural rights under N.J.A.C. 6A:16-7.6 and the Anti-Bullying Act, were not violated by his vice-principal, the school resource officer, or the school board. Consequently, defendants are entitled to summary judgment in their favor on all of plaintiff's claims, and plaintiff's cross-motion for summary judgment in his favor must be denied.

An appropriate Order will be entered.

Date: __October 20, 2016__          __s/ Noel L. Hillman__
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.